CASE 38—TRAVERSE—FEBRUARY 20.

1du:135
123  111

# Richmond and Lex. Turnpike Road Co. vs. Rogers.

### APPEAL FROM FAYETTE CIRCUIT COURT.

1. In condemning land for a bridge across the Kentucky river, the jury cannot allow to the proprietor of the land damages for any injury resulting to his ferry from the construction of the bridge.

2. In such cases the proprietor is entitled to the value of the land actually taken, and compensation for any incidental or collateral damage which the taking of it will produce to his other land. ( 2 *Rev. Stat.*, *p.* 443; 17 *B. Mon.*, 178).

3. Under our statutes, it is not necessary, on any stream, except the Ohio river, that the grantee of a ferry should own the land; but such owner is merely a preferred applicant for a ferry privilege, which, whether granted to the owner, or to another, is incidental to the title of only so much of the land as constitutes the site of the ferry.

4. A ferry is a public highway, established more for the public good than for the individual advantage of the grantee, and is exclusively under the control of the county courts.

G. ROBERTSON & D. BRECK, for appellants, cited *Sess. Acts*, 1833-4, *p.* 481; *Rev. Stat.*, *chap.* 103, *secs.* 14, 29, 30, 31; 11 *Peters*, 420; 6 *Howard*, 507; 4 *J. J. M.*, 30.

HUNT & BECK and M. C. JOHNSON, for appellees, cited 2 *J. J. M.*, 227; 5 *Dana*, 101; 17 *B. Mon.*, 178; *Redfield on Railways*, 136; 58 *Eng. Com. Law Rep.*, 454; 1 *Barb.*, 294.

CHIEF JUSTICE DUVALL DELIVERED THE OPINION OF THE COURT:

Under a charter granted by the Legislature in 1834, the Richmond and Lexington Turnpike Road Company constructed a turnpike road from Richmond, Kentucky, to Lexington.

By an amendment of the charter passed in 1857, the company was authorized to contract with the county courts of

Madison and Fayette for the building of a bridge across the Kentucky river, at or near Clay's ferry, and to change the location of the road so as to secure the building of the bridge at the most advantageous point; and, for that purpose, to purchase of the proprietors any lands required ; or, in case of disagreement as to price, to condemn the same in the manner provided in the Revised Statutes.

Pursuant to this authority, the location of the road was so changed as to cross the river at a point some distance above the ferry, which was then owned by Rogers on the Fayette side, and by Clay on the Madison side of the river ; and the company sued out a writ of *ad qu d damnum* for the condemnation of so much of the land owned by Rogers as was necessary for the construction of the bridge. The jury found that Rogers would sustain damages to the amount of $4,000, and the company traversed the finding. On the trial of the traverse the damages were assessed at $3,500, and judgment was rendered accordingly. From that judgment the company have appealed.

Rogers proved on the trial that the ferry then claimed and used by him had been claimed and used as such by those under whom he claims for many years before the grant of the charter to the appellants, and for some years before the burning of the clerk's office of the Fayette county court in the year 1803 ; that he was the owner of the bottom on the river for some distance above and below the ferry, as also the point at which it was proposed to build the bridge. He also introduced an order of the Fayette county court, showing, that in the year 1855, on his motion, the ferry was established "at the point where the Richmond and Lexington turnpike road crossed the Kentucky river, and where he wished to establish a public ferry." This application and order were made under the provisions of the Revised Statutes regulating ferries. On the part of the company it was proved, among other things, that the public would be greatly benefited by the construction of the bridge.

On this evidence the court instructed the jury, in substance, that if they believed from the evidence that the building of the

bridge at the place designated would impair the value of said ferry, then, in estimating the damages which Rogers will sustain by reason of taking a portion of said tract for a bridge, the jury must take into consideration the injury in value to said ferry, and give him fair compensation; and the court refused instructions asked by the company, to the effect that the jury could find no incidental or collateral damage, merely on the ground that the construction of a bridge on the land sought to be condemned would divert custom and travel from the ferry, thereby diminishing the income from it.

Whether the court, in giving and refusing these instructions, placed before the jury the true criterion and measure of compensation to which the appellee was entitled for the land sought to be appropriated by the company, is the principal question to be considered.

The constitution declares that private property shall not be taken for public use without just compensation to the owner; and it has been repeatedly decided that the compensation thus secured to the owner is the actual value in money of the property taken, which cannot be diminished by any speculative advantage the owner may derive from its appropriation to the public use. But the just compensation is not always limited to the value of the property actually taken. Where, for instance, a railroad was proposed to pass through a farm in such a way as to separate the dwelling and a portion of the improvements from the residue of the tract, and, by running parallel to another public road, to leave between the two roads a long narrow strip of land on which the dwelling and part of the other improvements were situated, the rest of the land and improvements being on the other side of the railroad, it was properly held that the land thus actually taken for the use of the railroad was to be valued with reference to its relative position to the residue of the tract, as well as to the improvements thereon. (17 *B. Mon.*, 178.)

The principle thus settled is in conformity with the provision of the Revised Statutes under which the present proceeding was had. "The jury shall allow the fair cash value of the land or property proposed to be taken, and also fair compensa-

tion for any incidental or collateral damage which the taking of it will produce to the other land of the owner," &c.   (2 *Rev. Stat., sec.* 29, *p.* 448.)   Beyond the limits thus indicated, this court has never extended the principle on which the just compensation guaranteed by the constitution is to be ascertained.

It is contended on the part of the appellee that his ferry franchise is an incorporeal hereditament incident to and growing out of the title of the land, and is thus as much a part and parcel of the land, and of the rights given by the ownership of it, as the trees or the crops which are produced from its soil, and that the appellee is therefore entitled, by the express terms of the statute just quoted, to compensation for the injury the ferry will receive.

But this proposition cannot be maintained either under the act of 1796, as subsequently amended, or under the Revised Statutes.   Under the former law it was decided in the case of *Lawless vs. Reese* (4 *Bibb,* 310) that it was not an objection to the establishment of a ferry that the applicant was not the owner of the land ; for cases might arise where the establishment of ferries would be of public utility, and the owners of the land be unwilling to keep them ; and it was plain that the Legislature had framed the law with a view to cases of that kind.   So, in the subsequent case of *Brown vs. Givens, &c.* (4 *J. J. M.,* 30), it was said that " a ferry is a public highway, and is established more for the public good than for the individual advantage of the grantee.   The interest of the people must, therefore, control and predominate over that of an individual. When a ferry is granted to one individual, the power is reserved to grant the like franchise to another at the same place if ' the common welfare shall require it.'   It is not necessary on any stream, except the Ohio, that the grantee of the ferry should own the land on the stream.   All that is required is that the owner shall be notified before a ferry shall be granted to any other person.   Another ferry cannot interfere with the landing of a pre-existing ferry."

The Revised Statutes have introduced no change in the law, so far as the rights of owners of land are concerned.   If no

owner of the land on either side of the stream over which a public highway passes will obtain the ferry right, or if, having obtained the right, he abandons or fails to keep it up according to law, the court may, after reasonable notice, grant the right to another, and in such case may cause to be condemned two acres of ground adjoining the landing, for the purposes of the ferry. (*Sec.* 7, *chap.* 39.) The owner of the land is, therefore, merely a preferred applicant for the privilege of establishing a ferry. The privilege is not an incident to the title of the land, nor a part and parcel of the rights given by the ownership. It is a privilege exclusively within the power of the county courts, to be exercised according to certain prescribed rules. The privilege cannot be granted for a longer period than twenty years. It cannot be sold or leased without leave of the court. The court has power to revoke the grant for a failure on the part of the grantee to comply with certain requirements of the law; also the power to prescribe the number and kind of boats to be kept and how propelled, and may once in every year change the same; and also the power to fix the rates of tolls, and to change the same once in every year.

But it is said that even if the ferry franchise is not part and parcel of the land, it is at any rate a business that can be exercised only at that place, and that even a business broken up in condemning land is a subject of compensation.

The introduction of turnpikes and railroads has broken up and destroyed many branches of business. The right to keep a tavern is a franchise very similar to a ferry franchise. It is granted and controlled by the same authority; it is granted for a limited period; it can be exercised only at the place designated in the grant; it is given, not for the mere benefit of the grantee, but for the benefit of the public. The history of public improvements in Kentucky by the construction of railroads and turnpikes would disclose numerous instances of the total destruction of the value of this franchise by the condemnation of the land of the grantee for the use of the turnpike or railroad; but it has never been even claimed, we presume, that the pecuniary injury resulting from the destruction of the value of this franchise was to be considered in estimating the damages for the land taken.

If the ferry right in this case had been granted, as it might have been, not to Rogers, but to another person, or had been, with the leave of the court, sold or leased to another by Rogers for the entire term, would the grantee, or vendee, or lessee, have been entitled to compensation for the injury to the ferry right occasioned by the construction of the bridge on another part of the same tract of land on which the ferry was established? Clearly not, because in such case the grantee, vendee, or lessee of the ferry would have no claim to, or interest in the land, except so much as was condemned or used for the purposes of the ferry, and it could not be said, therefore, that his *property*, or any portion of it, had been taken for public use. The claim of Rogers for compensation for the same injury does not, it seems to us, rest upon any better foundation; for it is admitted in argument that if the bridge were built, however near the ferry, on land owned by another person than Rogers, the latter could claim nothing for the injury to his ferry, although the injury would have been precisely the same, on the principle settled by the supreme court in the case of the Charlestown Bridge against the Warren Bridge, that the building of a new bridge, however injurious to a pre-existing bridge, will give the latter no right to enjoin the use of the former. But it is said that none of the *property* of the old bridge was taken for the use of the new bridge, and that in that respect the case is essentially different from the present. The fact alluded to does not at all affect or vary the principle in its application here. We have already shown that this ferry franchise is not an incident to Rogers' title to the entire tract of land on which the ferry is established. The order of court granting the ferry right fixes its locality at the point where the Richmond and Lexington turnpike road crosses the Kentucky river. If the grant had been to any other person than Rogers, the court might have caused "to be condemned the fee-simple right, or the use for not more than twenty years, if the owner so elect, of not more than two acres of ground adjoining the landing, together with the use for ferry purposes of any adjacent uninclosed bank of the stream." The ferry franchise then, whether granted to the owner of the land or to another,

is incidental to the title of so much of the land as constitutes the landing or site of the ferry, and to no other part of the adjoining land. No part of the ferry landing is proposed to be taken for the use of the bridge, and its construction will interpose no physical obstruction to the enjoyment of the ferry franchise. The land proposed to be taken for the use of the bridge must be paid for by the company, and they must also pay a fair compensation for any incidental or collateral damage which the taking of it will produce to the other land of the owner. But they are no more bound to compensate the owner for any incidental impairment of the profits of his ferry than they would be if the land to be taken had belonged to another, or if the ferry were located on a disconnected and separate tract.

It is a mistake to suppose that the appellee could, by his ownership of the land above and below his ferry, protect it from the competition of a rival ferry. Under the former law, as we have already seen, it was in the power of the county courts to establish in the same vicinity as many ferries as the public welfare required, without regard to the ownership of the land. Under the Revised Statutes no ferry can be established on the Ohio river within less than a mile and a half, nor upon any other stream within less than a mile of the place in a straight line, where any existing ferry was pre-established. (*Section* 16.) To this extent, and no further, is the grantee of a ferry privilege exempt from the competition of a rival ferry. Suppose the appellee had owned the shore for two miles above and below his ferry, and the necessities of travel had required the establishment of an additional ferry at some point above or below, within the lawful distance, and another person had, upon due notice, obtained the grant of a ferry at such point, would it be contended that in estimating the appellee's just compensation for the land taken for the use of the new ferry, the jury would be required to take into consideration the loss of profits of the pre-existing ferry, which would result from the establishment of the new one, merely because he was the owner of the land?

We have not considered it at all necessary or useful to go

into the doctrine which, at the common law, was applied to franchises of this description, and under which it was held that the grant of a franchise, either of a ferry or bridge, though necessarily local in its limits, was yet, for some purposes, deemed to extend beyond those local limits by operation and intendment of law. Those doctrines have no force or application here, having given way to the rules prescribed by our statutes regulating the entire subject. The effect of these statutes was aptly expressed by our predecessors in the case before cited : " A ferry is a public highway, and is established more for the public good than for the individual advantage of the grantee. The interest of the people must, therefore, control and predominate over an individual." The law imposes certain duties and burdens on the grantee, in consideration of which it extends to him certain immunities. These immunities do not, as seems to be supposed, include a right on the part of the grantee to any given amount of profits. On the contrary, the law expressly places the rate of tolls to be charged within the discretion of the county court, a discretion which is to be exercised with reference, not merely to the individual interests of the grantee, but to the interests and welfare of the traveling public.

In authorizing the grant of this and of all similar franchises, the Legislature did not thereby deprive itself of the power to construct other facilities of trade and travel, better adapted to the necessities of the public and to the improved and improving condition of the country, although the exercise of such power may, and generally does, result in individual loss and injury for which no legal means of redress are provided. Just compensation for the property taken—not every incidental or consequential injury resulting from the taking—is what the fundamental law guarantees to the owner.

We are of opinion that the burden of proof was on the traverser in the court below, and that he was, therefore, properly allowed the conclusion of the argument.

For the error mentioned the judgment is reversed, and the cause remanded for a new trial and further proceedings, not inconsistent with the principles of this opinion.